[Civ. No. 23325. Third Dist. Sept. 27, 1985.]

COUNTY OF BUTTE, Plaintiff and Appellant, v.
JOHN N. BACH et al., Defendants, Cross-complainants and Appellants;
BOARD OF SUPERVISORS OF BUTTE COUNTY et al.,
Cross-defendants and Appellants;
CARL MORTON et al.,
Cross-defendants, Cross-complainants and Appellants.

## COUNSEL

Hefner, Stark & Marois, Robert S. Willett and Judy R. Campos for Plaintiff and Appellant and for Cross-defendant and Appellant Board of Supervisors.

Kopp & Di Franco, Quentin L. Kopp, Don B. Kates, Jr., and William F. Fitzgerald for Cross-defendant and Appellant Wheeler.

James B. Lindholm, Jr., County Counsel (San Luis Obispo), Ralph R. Kuchler, County Counsel (Monterey), Denis A. Eymil, County Counsel (Kings), De Witt W. Clinton, County Counsel (Los Angeles), and Paul T. Hanson, Deputy County Counsel, as Amici Curiae on behalf of Plaintiff and Appellant and Cross-defendant and Appellant Wheeler.

John N. Bach, in pro. per., for Defendants, Cross-complainants and Appellants.

Moore, Crawford, Stefanki & Block, James Crawford, Kevin T. Cauley, Matheny, Poidmore & Sears, Michael A. Bishop, Price, Price, Brown & Halsey, Price, Price, Davis, Brown & Halsey and Philip B. Price for Cross-defendants, Cross-complainants and Appellants.

OPINION

BLEASE, J.—These consolidated appeals arise out of an action concerning the disputed use of a house in a residential zone as a law office. The action commenced with a zoning violation complaint by the County of Butte seeking to enjoin John N. Bach, an attorney, from so using the house. Bach and his spouse, who own the property, cross-complained for damages alleging that the zoning ordinance and its enforcement were violations of their federal civil rights. The Bachs named as cross-defendants the Board of Supervisors of Butte County, Supervisor Hilda Wheeler, the office of the county counsel, and several neighbors of the disputed premises who were active in the controversy (hereafter the neighbors). The neighbors in turn cross-complained against the Bachs seeking to enjoin the disputed use as a violation of a covenant running with the land. After a three-week hybrid court and jury trial the jury returned a verdict in the amount of $650,962 on the Bachs' damages claim; the county was awarded a limited injunction prohibiting Bach from employing in his law practice persons who did not reside on the premises; and the neighbors were denied relief on their cross-complaint, but spared liability for damages by judgment notwithstanding the verdict. After judgment was entered the trial court awarded the neighbors their costs and attorney's fees and denied the Bachs' request for an attorney's fees award. The parties appeal from each adverse aspect of the judgment and the post-judgment orders.

FACTS

This dispute concerns the use of the northwest corner lot at the T-intersection where Lorinda Lane terminates at Cohasset Road. Lorinda Lane is an east/west street developed in the early 1950's as a 41-unit subdivision for single-family residential use. At that time the surrounding area was rural and devoted to agricultural uses. Cohasset Road is a north/south street which connects the area of the dispute, an unincorporated area on the outskirts of the city of Chico, with that city. Cohasset Road has developed from two-lanes into a heavily trafficked four-lane arterial. Most of the property with frontage on Cohasset Road is now devoted to commercial or multi-family residential uses. Bach and his wife own the subject corner lot. They and their predecessors in interest have sought to devote it to more profitable uses than that of a single-family residence. A number of the homeowners on Lorinda Lane oppose any such use of the corner lot.

Prior to 1979, Lorinda Lane and Lindo Lane, the parallel adjacent street to the north, were zoned A-2. This classification permits a wide variety of uses including commercial activities such as law offices. In 1978 a contro-

versy arose when a house on Lindo Lane began to be used as a day care facility. Some residents of Lindo Lane had a meeting at the home of Virginia Lowen on Lindo Lane to discuss their displeasure at this development. Wheeler (a former resident of Lindo Lane), was a candidate for the board of supervisors at the time. She attended the meeting. Wheeler said she would do all that she could to assist the residents to have the area rezoned to prevent encroachment of commercial uses. Someone [other than Wheeler] voiced objections to the day care center on the ground that it would bring "undesirable" persons into the neighborhood, since the neighbors thought the day care center was associated with the CETA program.

In 1963, James and Frieda Stratton purchased the property which is the subject of this action. In September 1979 they put the property on the market for sale. James Stratton testified that one of the cross-defendant neighbors, Alan Dennison, came to his house and urged him not to sell to blacks, Mexicans, Chinese, or people with children. On October 24, 1979, the Strattons made a contract to sell the property to a Mr. Weinroth. In mid-November some of the homeowners on Lorinda Lane learned of the impending sale and that Weinroth intended to use the property for a real estate sales office. Three of the cross-defendant neighbors, Myrna Smith, Bill Smith, and Cathy Morton, met with an attorney, Neil McCabe, who advised them to circulate a petition for signatures asking the board of supervisors to zone the area R-1. McCabe dictated the contents of the petition which was circulated by Bill Smith and three of the other cross-defendant neighbors.

On November 20, 1979, Bill Smith appeared before the board of supervisors and presented the petition. He noted that the area was presently the subject of a zoning study by the planning commission and requested that the board interim zone the area R-1 until the zoning study was completed. On the motion of Supervisor Wheeler the area was interim zoned R-1 for 120 days. Wheeler had not been active in connection with the matter prior to the presentation by Smith to the board. Under the Butte County zoning ordinance the only use of right in an R-1 zone is that of a single-family dwelling. After the interim zoning measure was adopted the Strattons' sale to Weinroth "fell apart."

In January 1980, the Strattons listed the property with a real estate agency and on January 14 contracted to sell the property to Ann Willis and Sandra Hazel. On March 11, 1980, the zoning matter came before the board for consideration of extending the interim zoning measure. The owners of the

corner lots with frontage on Cohasset Road, including the Strattons, appeared at the board meeting and requested that the zoning designation on the corner lots be R-4, a zone that permits businesses and professional offices. The board granted this request continuing the R-1 zoning for all of the other lots. Supervisor Wheeler abstained from the vote. The neighbors who had precipitated the interim zoning to prevent commercial use of the Strattons' property were not present at the board hearing. Wheeler had told them that continuation of the R-1 zoning would be routine and that they need not attend.

Wheeler arranged for use of the Chico Municipal Courtroom for a meeting on March 27, 1980, with the disgruntled homeowners from the neighborhood. At her request a member of the county counsel staff and a member of the planning commission staff attended. Approximately 75 people attended the meeting. The purpose of the meeting was to discuss prospects for reversing the decision to zone the corner lots R-4. After the meeting various residents in the neighborhood wrote letters addressed to the board of supervisors requesting that the decision to interim zone the lots R-4 be modified to interim R-1 zoning. At the board meeting on April 8, 1980, Wheeler submitted a packet of the letters to the board. She had telephoned the Strattons and another owner of one of the corner lots to advise them that the topic would be raised at the board meeting. Both Willis and the Strattons spoke at the meeting and argued that the interim zoning should not be changed. The county counsel advised the board that they had the power to modify the interim zoning ordinance if they wished to do so. The board voted to change the designation of the corner lots from R-4 to the interim R-1 designation.

On August 19, 1980, when the pending zoning study was completed, on the recommendation of the planning commission, the board enacted a regular zoning ordinance zoning the subject property R-1. On August 20, 1980, Hazel and Willis made a contract to sell the property to John Bach. Bach was informed that the zoning of the property was R-1 from the outset of negotiations. Bach began using the premises as a law office on October 1, 1980.

Under the county zoning ordinance it is permissible to use a single-family dwelling in an R-1 zone for professional offices. However, the ordinance says employment in the enterprise must be limited to members of the family residing on the premises. Myrna Smith, a resident on Lorinda Lane, testified that on many occasions after Bach moved in she rang the door bell at the subject property at night when she walked her dog. No one had answered. She also testified that she saw Mrs. Bach arrive in a car and pick up Mr. Bach at 10 or 10:30 p.m. on six occasions.

John Bach testified that when he is in a trial that lasts a week or longer or if he has briefs to get out he stays overnight at the subject property. His wife understands that this is a consequence of his devotion to the practice of law. His wife and children have used the house for meetings and have used the office equipment. The children have toys at the house. Bach's relatives drop by to visit him at the premises. In his opinion he is using the property as a residence because of his lifestyle and the way he practices law. He employs two persons in his law practice, his wife and another woman who is employed as a secretary. In his view he has two homes. His wife and the children reside at the other home at 956 Vallombrosa which he and his wife had built in 1971. Bach is registered to vote at the Vallombrosa address.

Soon after Bach opened his law office Mabel Dennison, a Lorinda Lane resident, telephoned Supervisor Wheeler and reported that fact. Wheeler referred the matter to the county zoning investigator. The investigator, Vincent Anzalone, received nine letters from neighbors complaining that the law office use was in violation of the zoning ordinance. Anzalone went to the property and found a sign announcing that John Bach had moved his law office to the premises. On October 7, 1980, Anzalone sent a notice of zoning violation to the owners of record, Willis and Hazel. He received a letter from Hazel informing him that the property had been sold on October 18, 1980, to John Bach. Thereafter he sent a notice of zoning violation to Bach. Bach did not reply.

Anzalone decided Bach's use was in violation of the zoning ordinance and he reported his findings to the county counsel on October 27, 1980. The office of the county counsel recommended to the board of supervisors that a zoning enforcement action be filed. On November 18, 1980, the board voted to commence such an action. On December 8, 1980, the complaint was filed: it was amended once prior to trial. As amended it alleges that the zoning on the subject property is R-1 and that Bach's use of the property for a law office is a violation of the zoning ordinance. Bach's answer to the amended complaint denies the material allegations on information and belief. The answer also tenders as an affirmative defense that the pertinent provisions of the county zoning ordinance are facially unconstitutional and unconstitutional as applied. The answer asserts the county should be denied enforcement of the ordinance because it discriminates against Bach and the prior owners by improper zoning and because the county had failed to enforce zoning regulations against other violators.

As related, the Bachs filed a cross-complaint. The Bach cross-complaint alleges that the county zoning ordinance is unconstitutional because Cohasset is a major thoroughfare; all other property fronting on Cohasset is zoned

less restrictively than R-1, and the zoning enforcement action is a sham filed for the purpose of obstructing John Bach's ability to practice law. After the verdict was rendered at the trial Bach was permitted to amend the cross-complaint to conform to proof. The amended cross-complaint adds the claim that John Bach is the assignee of all claims against the cross-defendants from Hazel, Willis, and the Strattons. The nature of the assigned claims are not set forth except for the allegation that the cross-defendants have discriminated against the Bachs' ownership and use of the subject property by failing to give "property notices as required to cross-complainants and their said assignors re any and all zoning applications or for the enactment of zoning ordinances . . . ."

The cross-defendant neighbors denied the material allegations of the Bach cross-complaint and filed a cross-action of their own seeking injunctive relief against the Bachs. The neighbors' cross-complaint alleges that the Lorinda Lane block is subject to a restrictive covenant which forbids any non-residential use of the lots and that Bach's law office is a violation of this covenant. The Bachs answered the neighbors' cross-complaint and the matter eventually was tried. John Bach represented himself and his wife throughout the proceedings with the exception that he associated counsel for the purpose of eliciting his own testimony at trial.

The Bachs' damage claim was submitted to the jury along with interrogatories. The jury returned a verdict that the Bachs recover damages from each named cross-defendant in the amount of $650,962. The interrogatories reveal the jury found that the cross-defendants "unjustly discriminated against the subject property . . . or against the owners thereof, including the cross-complainants John N. Bach or Janet L. Bach." The award includes $10,962 for damages on the claim assigned to him by the Strattons, $50,000 for lost income to John Bach, $50,000 for lost time or lost profit of John Bach, $40,000 for loss in property value of the subject property, $250,000 general damages to the Bachs, and $250,000 punitive damages.

After the jury returned its verdict the trial court ruled on the causes of action for injunctive relief. The county's request for enforcement of the zoning ordinance was granted in part. The court found the ordinance valid but also found that the county had failed to prove John Bach was not residing on the property. Accordingly, the court granted an injunction prohibiting Bach from employing persons who neither reside on the property nor are members of his family.

The neighbors were denied relief on their cross-complaint. The trial court found that the restrictive covenant is a covenant running with the land and prohibits use of the subject property as a law office. The trial court also

found that the purpose of the covenant is to protect the residential character of the subdivision along Lorinda Lane, that no other change from residential use had occurred within the subdivision, and that the purpose of the covenant could be met by enforcing it. However, the court found that it would be inequitable to enforce the restrictions in view of the change in use of the real property in the vicinity outside the subdivision.

The neighbors moved for judgment notwithstanding the verdict and for a new trial on the Bachs' damage claim. The trial court granted the motions in the alternative. The court reasoned that all that was shown regarding the neighbors was that they had lawfully petitioned their governmental representatives and concluded that this is not actionable. The trial court also granted a judgment notwithstanding the verdict to the office of the county counsel on the ground that the "office" is not a legal entity subject to suit.

Judgment was entered in accordance with the jury verdict and these rulings of the trial court. After judgment the Bachs sought an award of costs and attorney's fees. The cross-defendant neighbors also sought an award of costs and attorney's fees against the Bachs. The Bachs' request for an award of attorney's fees was denied on the ground that a pro se litigant should not be allowed to recover such an award. The neighbors were awarded their requested costs and fees.

## DISCUSSION

### I

We begin with the Bachs' appeal and the cross-appeal of the County of Butte from the portion of the judgment granting the county a limited injunction enforcing the zoning ordinance. The Bachs contend that the trial court erred in upholding the zoning ordinance and granting a limited injunction forbidding employment of nonresidents in John Bach's law office. The county contends the trial court erred in failing to enjoin the Bachs from all nonresidential use of the premises as a law office, e.g., use by John Bach in the manner shown by the evidence. The contention of the Bachs has no merit and that of the county has merit. We address the cross-contentions seriatum.

### A.

The Bachs' briefing is a jumble of undeveloped arguments. ■ As best we can make out the primary argument is that the zoning ordinance is "discriminatory" as applied to the subject property and thus cannot be enforced to restrict use of the property for a lawyer's office to persons who

reside on the property. A zoning ordinance cannot lawfully be applied to restrict a use if to do so is arbitrary and unreasonable, bears no reasonable relationship to the regional welfare, or deprives the landowner of substantially all use of the property. (See *Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 521 [169 Cal.Rptr. 904, 620 P.2d 565].) We find no support for the conclusion that the ordinance in issue is discriminatory as applied.

■ We are mindful of the posture of our review of a challenge to a zoning regulation: "As to the findings, we note initially that, although denominated findings of fact, they are in the nature of conclusions of law and thus subject to appellate review. Moreover, . . . '[T]he findings and conclusions of the trial court as to the reasonableness of a zoning ordinance are not binding on an appellate court if the record shows that the question is debatable and that there may be a difference of opinion on the subject.' (*Johnston* v. *City of Claremont* (1958) 49 Cal.2d 826, 839 [323 P.2d 71]; *Lockard* v. *City of Los Angeles* (1949), *supra,* 33 Cal.2d 453, 462 [202 P.2d 38, 7 A.L.R.2d 990].) The necessity for such review of findings of the trial court inheres in the judicial review accorded zoning enactments; the courts must look, not to the experts' opinion as to the most desirable zoning, but for the presence of any rational support for the legislative determination." (*Hamer* v. *Town of Ross* (1963) 59 Cal.2d 776, 787 [31 Cal.Rptr. 335, 382 P.2d 375].)

■ The first category of discriminatory zoning is that which is arbitrary and unreasonable. (*Arnel, supra,* 28 Cal.3d at p. 521.) "Where it is claimed that the [zoning] ordinance is unreasonable as applied to . . . property, . . . it is incumbent on [the proponent of the claim] to produce sufficient evidence from which the court can make such findings as to the physical facts involved as will justify it in concluding, as a matter of law, that the ordinance is unreasonable and invalid. It is not sufficient for him to show that it will be more profitable to him to make other use of his property, or that such other use will not cause injury to the public, but he must show an abuse of discretion on the part of the zoning authorities and that there has been an unreasonable and unwarranted exercise of the police power." (*Wilkins* v. *City of San Bernardino* (1946) 29 Cal.2d 332, 338 [175 P.2d 542].)

■ "An examination of the California decisions discloses that the cases in which zoning ordinances have been held invalid and unreasonable as applied to particular property fall roughly into four categories: 1. Where the zoning ordinance attempts to exclude and prohibit existing and established uses or businesses that are not nuisances. [Citations.] 2. Where the restrictions create a monopoly. [Citations.] 3. Where the use of adjacent property renders the land entirely unsuited to or unusable for the only pur-

pose permitted by the ordinance. [Citation.] 4. Where a small parcel is restricted and given less rights than the surrounding property, as where a lot in the center of a business or commercial district is limited to use for residential purposes, thereby creating an 'island' in the middle of a larger area devoted to other uses." (*Wilkins, supra,* at p. 340.) The "physical facts involved" in this case are not within any of these categories.

It was established at the trial that the subject property and the other corner lots at the intersections of Lorinda Lane and Lindo Lane with Cohasset Road are the only property with frontage on Cohasset Road that are zoned R-1. However, there was no compelling showing that the nearby commercial and multi-family dwelling uses rendered these lots entirely unsuited to or unusable for the purpose of a single-family dwelling. The most that can be said of the impacts of the surrounding uses, including the traffic flow on Cohasset Road, is that they make the corner lots zoned R-1 somewhat less desirable for use as single-family dwellings.

■ Where reasonable persons can disagree concerning where the line should be drawn, either alternative may be selected without resulting in unreasonable, discriminatory zoning. (E.g., *Clemons* v. *City of Los Angeles* (1950) 36 Cal.2d 95, 98 [222 P.2d 439].) ■ Here, if the corner lots are excluded from the R-1 zone, the immediate burden of abutting a higher use zone is shifted to the second lot from the corner, and the disadvantages of commercial use encroachment onto the residential block are placed upon the remaining homeowners on the block. The alternative, which retains the corner lots in the R-1 zone, avoids this harm to the remainder of the property owners at the cost of the value increment of the corner lots if freed for commercial development. Reasonable persons may disagree concerning which choice is the more appropriate way to distribute the burden. Accordingly, there is no basis for overturning the alternative chosen by the county zoning authorities.

The Bachs imply that the zoning is nonetheless discriminatory under the second category noted in *Arnel, supra,* because it bears no reasonable relationship to the regional welfare. They rely upon *Arnel Development Co.* v. *City of Costa Mesa* (1981) 126 Cal.App.3d 330 [178 Cal.Rptr. 723] (hereafter *Arnel II*), the opinion on remand of *Arnel, supra.* In *Arnel II* an initiative rezoned undeveloped land R-1 to forestall a proposed development that would have included apartments for moderate income families. At the time there was a shortage of low and moderate income housing in the jurisdiction. The *Arnel II* court concluded that in view of the shortage of moderate income housing and the size of the development the zoning ordinance was "not rationally related to the general regional public welfare, but, at best, [only] to conserving the interests of the adjoining property owners and

residents of the immediate area." (*Id.*, at p. 337; fn. omitted.) ■ ■■■ ■■ The Bachs' argument lops off the head of this statement and stands it on its tail. They assert that the zoning ordinance in this case is not reasonably related to the general public welfare because it only conserves the interests of the adjoining property owners and residents of the immediate area.[1] This illogic does not warrant protracted refutation.

*Arnel II* follows *Associated Home Builders etc. Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]. *Associated Home Builders* added the regional welfare perspective to the bases for overturning a zoning ordinance. However, this perspective is only applicable with respect to ordinances with substantial effect beyond municipal boundaries. (*Id.*, at p. 607.) Here there is an utter absence of any showing that the challenged zoning ordinance has such an effect. Neither *Associated Home Builders* nor *Arnel II* has any application to this case.

The remaining category of grounds for a finding of discrimination in the application of the zoning ordinance—that it deprives the landowner of substantially all use of the property—is also not presented. John Bach himself testified that the fair market value of the lot when subject to the R-1 restriction is $80,000. We find no support for the claim that the zoning ordinance is unconstitutional as applied to the Bachs' property.

## B.

■ The Bachs also hint that the zoning ordinance is facially invalid. They note in their brief that in *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219] the California Supreme Court struck down a provision of a zoning ordinance which limited residences in an R-1 zone to family units or unrelated persons in a unit no larger than five persons. Immediately thereafter the Bachs claim that the home occupation provision of the zoning ordinance is constitutionally flawed. We divine from this juxtaposition that the Bachs would apply the *Adamson* holding to the home occupation provision of the Butte County

---

[1]The Bachs suggest that, by advancing the interests of the neighbors who opposed commercial use of the corner lots, Supervisor Wheeler, and by attribution the County of Butte, acted improperly. The implication is that Wheeler's affiliation with the cause of those constituents who opposed the commercial use is an illicit motivation for her official acts in the course of the controversy. With few exceptions, e.g., racially discriminatory *animus*, none of which are made out in this case, the motive of officials enacting a zoning ordinance is immaterial. (See *McCarthy* v. *City of Manhattan Beach* (1953) 41 Cal.2d 879, 894 [264 P.2d 932].) Absent such an unconstitutional motivation, we discern no legal impropriety in an elected official siding with one faction in what is, so long as the alternative chosen is not unreasonable, ultimately a political contest. (Cf. *City of Fairfield* v. *Superior Court* (1975) 14 Cal.3d 768, 781-782 [122 Cal.Rptr. 543, 537 P.2d 375].)

zoning ordinance. The ordinance limits use of a house in an R-1 district for "home occupations"[2] to "members of the family residing on the premises."[3] Family is defined in a fashion similar to the ordinance in the *Adamson* case, to exclude groups of more than six unrelated persons.[4] However, the apparent *Adamson* flaw in the Butte County zoning ordinance is not germane to this case. To attack the ordinance on *Adamson* grounds the Bachs would have to claim that a group of more than six unrelated persons were residing on the premises and conducting an otherwise permitted home occupation. (Cf. *Stocks* v. *City of Irvine* (1981) 114 Cal.App.3d 520, 530-531 [170 Cal.Rptr. 724].) A determination that the ordinance is invalid under *Adamson* would be of no avail, since the *Adamson* flaw was not the cause of any harm to the Bachs.

The remaining arguments of the Bachs for finding that the ordinance could not lawfully be applied to the subject property are even more fragmentary than the foregoing. ■ The Bachs assert that the county should be estopped to enforce the ordinance. However, no basis for an estoppel is readily apparent. The Bachs did not acquire any interest in the property until after the permanent zoning ordinance was enacted. The Bachs make no effort to set forth the criteria for those rare circumstances (see *City and County of San Francisco* v. *Burton* (1962) 201 Cal.App.2d 749, 756 [20 Cal.Rptr. 378]) in which estoppel will run against a governmental entity, much less to explain how those criteria might be satisfied here. Accordingly, we reject the claim without further discussion. The remaining theories of unconstitutionality of the zoning enforcement bandied at trial are not pursued in this appeal and we deem them waived.[5] In sum there is no credible

---

[2] Section 24-21-47 of the ordinance, entitled "Home Occupation" provides in pertinent part: "Any of the following businesses or services conducted on the premises by occupants of residential dwellings or mobile homes: . . . (c) Professional offices and services."

[3] Section 24-200 of the ordinance, entitled "Home Occupations," provides in pertinent part: "Notwithstanding any provision to the contrary in this chapter, home occupations as defined in Section 24-21-47 are allowed in all zones which allow dwellings and mobile homes except in cases where such occupations are objectionable because of noise, odor, smoke, dust, bright light, vibration, pollution, traffic congestion, unsafe access, or the handling of explosives or dangerous materials. In such cases a use permit shall be required. All home occupations shall be subject to the following conditions: [¶] (a) Employment and work on home occupations shall be limited to members of the family residing on the premises . . . ."

[4] Section 24-21.14 of the ordinance provides: "*Family:* An individual or two (2) or more persons related by blood or marriage or a group of not more than six (6) persons (excluding servants) who need not be related by blood or marriage, living together in a dwelling unit."

[5] None of these theories has any facial indication of merit. For example, the Bachs claimed that they were denied equal protection in the cross-complaint, but no showing was made that they were the target of invidious intentional discrimination in enforcement of the ordinance. (See, e.g., *City etc. of San Francisco* v. *Burton, supra,* 201 Cal.App.2d at p. 755.) The Bachs did not show that others similarly situated were not prosecuted, nor did they show that their selection for prosecution was on an impermissible ground. (See *Kuzinich* v. *County of Santa Clara* (9th Cir. 1982) 689 F.2d 1345, 1349.)

The only colorable claim of impropriety in the history of this dispute is that the county

basis tendered for overturning the ruling that the Butte County zoning ordinance is valid and enforcible against the Bachs.

## C.

■ The county contends that the only defect in the judgment pertaining to its zoning enforcement claim is the finding that John Bach resides on the premises and thus may conduct a law office under the home occupation provisions of the zoning ordinance. The county argues that the trial court misconstrued the ordinance and that Bach's use of the subject property does not satisfy the requirement that home occupation use be limited to persons residing on the premises. We agree.

There is no material dispute concerning the activities of John Bach, members of his family, or his employees in the use of the subject premises. ■ The dispute concerns the definition of the phrase "residing on the premises" as used in section 24-200 of the zoning ordinance (fn. 3, *ante*). This is a question of law. (Evid. Code, § 310; e.g., *Neuber v. Royal Realty Co.* (1948) 86 Cal.App.2d 596, 622 [195 P.2d 501].)[6] The Bachs submit that

"modification" of the interim zoning ordinance changing the designation of the property from R-4 to R-1 was improper. Arguably the modification of the interim ordinance was ultra vires for noncompliance with state statutes governing the interim zoning process. (See Gov. Code, § 65853, but see Gov. Code, § 65801.) The root defect of the noncompliance is possible lack of notice to the affected landowner. Conceivably the lack of notice could rise to constitutional stature. (See *Horn v. County of Ventura* (1979) 24 Cal.3d 605 [156 Cal.Rptr. 718, 596 P.2d 1134].) But here the Bachs' predecessors in interest received actual notice, attended the modification session, and took an active role therein. Moreover, whatever the effect of impropriety upon the second interim zoning, there is no cognizable claim of impropriety in adoption of the permanent ordinance. (The Bachs did imply that the taint of the interim ordinance corrupted the planning process, but this is simply too remote.) Since the Bachs did not acquire any interest in the property until after the permanent ordinance was enacted, they may not claim damage from a defect in the interim ordinance. As to the assignments of their predecessors, even if valid, no showing of damages attributable to the alleged defect in the interim zoning ordinance was made.

[6]One of the many miscues in the proceedings below was the implication to the jury that their role included interpretation of the term resident in the zoning ordinance. The interrogatories to the jury include: "Were cross-complainants, John N. Bach or Janet L. Bach, residing at 898 Lorinda Lane as you interpreted the term 'residing' as used in the Home Occupancy Ordinance 24-200?" The jury answered yes. The trial court did assay a definition of reside for the jury. The definition improperly turns on the subjective intent of the user of the property to knowingly disobey the zoning ordinance and is also inadequate for the reasons given in the text. The jury was instructed:

"The words 'dwell' or 'dwelling' or 'resides' or 'residence' in these instructions—as used in these instructions mean one's home as distinct from one's place of business or professional office. [¶] One may dwell in a professional office if there is a good faith intent to use the professional office as one's home or dwelling. [¶] One may dwell in more than one location. One may have more than one home. [¶] In the case now before you for your decision, the jury must determine whether Mr. Bach in good faith used the premises at 898 Lorinda Lane as a home or a dwelling place instead of or in addition to the premises at 956 Vallombrosa or whether the context of the use of the premises at 898 Lorinda Lane as a dwelling or a home or a residence was a mere subterfuge to evade the applicable zoning ordinances."

residing means merely to dwell in a place for some period of time for business or other purpose which does not depend on the manner of living or use. They rely for this definition upon *In re Morelli* (1970) 11 Cal.App.3d 819, 830-831 [91 Cal.Rptr. 72], a case that defines the term residence as used in former Code of Civil Procedure section 1989 (Stats. 1957, ch. 1560, § 1), concerning the duty of a witness to travel from his place of residence to the place of trial. *Morelli* is not authority for a definition in this dissimilar context. *Morelli* itself cautions that residence "has various meanings for varying legal concepts and under different statutes, depending upon the purpose involved." (*Id.,* at p. 830; also see *City of Beverly Hills* v. *Brady* (1950) 34 Cal.2d 854, 856 [215 P.2d 460], definition of "business" in zoning ordinance "depends upon the adopted definition of that word and the primary intent of the zoning restrictions.")

The purpose of the limitation of the right to conduct a home occupation to persons who "reside" on the premises is to limit encroachment of commercial users on the residential zone. The meaning of reside must be consonant with this purpose. The meaning proposed by the Bachs is so elastic that one could make full-time commercial use of a residence under the home occupation provision of the ordinance based upon any part-time occupancy for noncommercial use, regardless of the disparity between residential and commercial use. This reading has the tail wagging the dog and would result in an evisceration of the restriction of noncommercial uses.

A home occupation exception to residential zoning use restrictions is an accommodation between the values fostered by those restrictions and the conflicting value served by permitting a person the liberty to conduct economic activity in his home. (See *Brady, supra,* 34 Cal.2d at pp. 856, 857.) The accommodation is implicitly premised upon expectations that the number and distribution of such encroachments will not be intolerable and that persons who live where they work are likely to have less detrimental impact than nonresidents. (See, e.g., *Keller* v. *Town of Westfield* (1956) 39 N.J.Super 430 [121 A.2d 419].) The home occupation exception in a zoning ordinance is often explicitly described as one for "accessory uses" that are "incidental" to the use of the premises as a residence. (See, e.g., *Jones* v. *Robertson* (1947) 79 Cal.App.2d 813 [180 P.2d 929]; Cal. Zoning Practice (Cont.Ed.Bar 1969) § 8.4; 8 McQuillin, Municipal Corporations (3d rev. ed. 1983) Zoning, § 25.130.) Where this is not explicit it is contextually implicit. ▮ Here, John Bach's use of the property for "residential" purposes is, at best, accessory to and incidental to the primary use of the premises for law office purposes. We hold that a person whose residential use of a house is so disproportioned to its commercial use is not "residing on the premises" within the meaning of section 24-200 of the Butte County

zoning ordinance. Accordingly, the trial court erred in failing to enjoin Mr. Bach from such use of the subject premises.

## II

The Butte County Board of Supervisors and Hilda Wheeler appeal from the portion of the judgment awarding the Bachs damages on their civil rights cross-complaint. It is apparent that there is a fundamental contradiction between the trial court ruling that the Butte County zoning ordinance is valid and enforceable and the trial court ruling upholding the jury award of damages to the Bachs.[7] Enforcing the ordinance entails the finding that it is valid on its face and as applied to the Bachs. (See *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 272-277 [157 Cal.Rptr. 372, 598 P.2d 25].) John Bach tendered, inter alia, the same constitutional defenses to enforcement of the ordinance as were tendered in the cross-complaint for damages for violation of the Bachs' federal civil rights. A judgment cannot be premised on different answers to identical material questions. (See, e.g., *Learned* v. *Castle* (1889) 78 Cal. 454, 460 [21 P. 11].) However, where there is no substantial evidence for one of two contradictory findings it may be disregarded.[8] (See, e.g., *Wallace Ranch W.*

---

[7] The jury's verdict was rendered after an 18-day trial that featured extensive and often extraneous examination by John Bach of the other dramatis personae. The verdict is premised on vacuous instructions concerning the basis of a finding of liability. The jury was instructed in essence as follows. The rights of citizens include, "the securing of life, liberty, property, freedom of expression, the right to practice and/or pursue one profession, work, trade or vocation and the right to have public entities and officials, elected or appointed, apply and enforce the laws equally and fairly as to all." Liability can be predicated upon deprivation under color of law of any of these rights. There is a federal constitutional right to privacy that ". . . protects our homes, families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose."

"The test when a zoning ordinance is attacked as being in excess of the police power is whether or not the ordinance bears a substantial and reasonable relationship to the public welfare. However, the principle limiting inquiry into the legislative body's police power objectives does not bar scrutiny of a quite different issue, that of discrimination against a particular parcel of property." [¶] "A county or city cannot unfairly discriminate against a particular parcel of land, and the jury is to consider and decide whether the scheme of classification has been fairly applied and impartially [*sic*] in each instance."

These instructions contain no meaningful standards, i.e., statements of the elements of particular legal theories of violation of federal civil rights.

[8] An alternative route to resolving the contradiction is to view the trial court resolution of the issues presented as logically prior to the jury resolution. As John Bach noted at trial, when overlapping equitable and legal, i.e., jury, issues are tried in the same action the court should first resolve the equitable issues. (E.g., *Connell* v. *Bowes* (1942) 19 Cal.2d 870 [123 P.2d 456]; see also 7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 153.) If and only if legal issues remain need they be submitted to the jury. (See, e.g., *Veale* v. *Piercy* (1962) 206 Cal.App.2d 557 [24 Cal.Rptr. 91].) Here the adverse resolution of the issues of violation of the Bachs' civil rights by the trial court is controlling over the jury's differing resolution even if substantial evidence supports both alternatives.

*Co.* v. *Foothill D. Co.* (1935) 5 Cal.2d 103, 118 [53 P.2d 929].) In our previous discussion we have concluded there was no showing of discriminatory zoning in the record. ██ ██ Accordingly, the jury verdict awarding the Bachs damages for violations of their federal civil rights cannot be upheld.[9]

### III

 The neighbors contend the trial court erred in denying injunctive relief enforcing the restrictive covenant. They contend that there is no substantial evidence to support the finding that the changed conditions outside of the tract governed by the covenant have made it inequitable to enforce the covenant. They argue that enforcement of the covenant against the Bachs would be a substantial benefit to the residential property owners in the tract and that changes outside of the tract are an insufficient reason to deprive them of this benefit. The Bachs make no reply to the neighbors' contention. Accordingly, we deem the matter submitted on the neighbors' brief and that the sole issue is that tendered therein. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 425, 438-440.) The contention is meritorious.

 A covenant running with the land is not self-enforcing. The persons aggrieved must seek equitable relief to obtain specific enforcement. "A change in the character of a neighborhood from that which was intended to be created by restrictions has generally been held to prevent enforcement of the restrictions in equity, where the change is such that it is no longer possible to accomplish the original purpose intended by the restriction, or where enforcement would be inequitable, or unreasonable, or oppressive." (See Annot. (1973) 53 A.L.R.3d 492, 494; fn. omitted.) The original purpose of the restriction of the Lorinda Lane lots to residential use was to prevent a change in the character of the tract by the introduction of commercial uses that would diminish the desirability of the tract for residential purposes. The trial court found that this purpose could be served by enforcement. However, enforcement was denied on the ground that changes outside the tract rendered it inequitable. This is a finding of fact and the issue is whether there is substantial evidence to support it. (E.g., *Key* v. *McCabe* (1960) 54 Cal.2d 736 [8 Cal.Rptr. 425, 356 P.2d 169].)

---

[9]A portion of the verdict awarded $10,062 as damages of the Strattons that were assigned to John Bach. The Strattons were allegedly "damaged" when the initial interim ordinance cost them their proposed sale to Mr. Weinroth. However, as R-1 zoning is not "discriminatory" and there is no claim made out of procedural impropriety in the adoption of the initial interim zoning ordinance, the "damages" of the Strattons are not actionable. We imply no view on the propriety of Mr. Bach's pursuit of this assignment. (Cf. Bus. & Prof. Code, § 6129.)

"Generally speaking, in determining whether there has been such a change of conditions as to warrant a refusal to enforce, or a cancellation of, restrictions, the courts give greater weight to the changes occurring within the restricted area than to those occurring without the area." (20 Am.Jur.2d, Covenants, Conditions, etc., § 284, p. 849; fn. omitted.) Changes within a contiguous tract are more likely to render the original purposes of the restriction obsolete and may add the additional equity of waiver to the calculus. Nonetheless, changes wholly outside the tract can suffice. Where the changes render the restricted property valueless equity may side with the party who seeks to lift the restriction despite evidence that enforcement would benefit the other properties in the tract. (*Downs* v. *Kroeger* (1927) 200 Cal. 743 [254 P. 1101].) The underlying notion is that such a drastic change in circumstances was not within the contemplation of the original contracting parties and relief is justified under a doctrine akin to discharge by supervening frustration. (See *id.,* at p. 748; cf. Rest.2d Contracts, § 265; but see Comment (1927) 16 Cal.L.Rev. 58, 61, observing that one who purchases a boundary lot of a tract can be viewed as on notice of possible changes outside the tract.) Thus, in cases upholding a denial of enforcement of a single-family residence use restriction there is a finding and supporting evidence that the property is not "suitable" for residential use. (See, e.g., *Wolff* v. *Fallon* (1955) 44 Cal.2d 695, 696 [284 P.2d 802]; *Key* v. *McCabe, supra,* 54 Cal.2d at pp. 737-738; *Bard* v. *Rose* (1962) 203 Cal.App.2d 232, 236 [21 Cal.Rptr. 382]; *Hirsch* v. *Hancock* (1959) 173 Cal.App.2d 745, 755 [343 P.2d 959].)

In this case such a finding is not presented and there is no substantial evidence to support such a finding. There is substantial evidence that the corner lots have become less desirable for use as a single-family dwelling because of increased traffic on the adjacent street, associated litter, and the unsightly view of commercial uses across Cohasset Road. There is also evidence that the Strattons experienced difficulty in attracting a purchaser for the property when they offered it for sale and that the property would be worth significantly more for commercial purposes ($150,000), than residential ($80,000). However, Bach's testimony to the latter figure reveals that the property has substantial value for residential use purposes. "The mere fact that the property has become more desirable or valuable for business than for residence purposes, where the restriction, notwithstanding the change of conditions, still is of substantial advantage to the dominant property, will not necessarily defeat application for equitable relief." (*Strong* v. *Shatto* (1919) 45 Cal.App. 29, 37 [187 P. 159], reversing a judgment granting relief from residential use restriction; also see, e.g., *Lincoln Sav. & Loan Assn.* v. *Riviera Estates Assn.* (1970) 7 Cal.App.3d 449, 460 [87 Cal.Rptr. 150].) There is no substantial evidence here that the changed circumstances rendered the purpose of the covenant

unattainable—indeed there is a finding to the contrary. In declining to enforce the covenant in these circumstances the trial court misperceived the reach of the applicable equitable doctrine.

## IV

The Bachs contend the trial court erred in allowing the neighbors to claim their attorney's fees as costs. The claimed warrant for the fee award is 42 United States Code section 1988 which provides that in a federal civil rights enforcement action reasonable attorney's fees may be awarded the prevailing party.[10] While an award to a prevailing plaintiff is routine, an award to a prevailing defendant may only be allowed where the trial court finds " 'that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.' " (*Hughes* v. *Rowe* (1980) 449 U.S. 5, 14-15 [66 L.Ed.2d 163, 172-173, 101 S.Ct. 173]; also see Annot. (1979) 43 A.L.R.Fed. 243, 275-278 and cases collected therein.) The Bachs argue that such a finding could not properly have been made in this case.[11] The neighbors reply that the implied finding was proper since the Bachs introduced no evidence of the claimed conspiracy to violate his federal civil rights.[12] They

---

[10]Section 1988 provides in pertinent part: "In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

[11]The Bachs also argue that the absence of a complete date in the verification paragraph on the neighbors' memorandum of costs form rendered the fee request void. A memorandum of costs must be verified. (Code Civ. Proc., § 1033, see 7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, § 118.) A verification may be made by certification under penalty of perjury. (Code Civ. Proc., § 2015.5.) Such a certification must substantially follow the form set out in Code of Civil Procedure section 2015.5, which includes a provision that the declarant include the date of execution. (*Ibid.*) The defect claimed here is providing a date which stated a month and year of execution but no day. Assuming arguendo that this variance is substantial the Bachs' argument is nonetheless unpersuasive. The memorandum of costs on its face refers the reader to an attached declaration. The declaration thus incorporated reiterates and amplifies the claim for attorney's fees and is executed with a certification that includes a complete date. This cures the claimed deficiency in the memorandum of costs. (See *Pacific Southwest Airlines* v. *Dowty-Rotol, Ltd.* (1983) 144 Cal.App.3d 491, 494-495 [193 Cal.Rptr. 25].)

[12]The Bachs' opening brief on the attorney's fees orders asserts as an issue to be decided: "Appellants John N. Bach's and Janet L. Bach's request for formal order and their request for preparation of findings as required per 42 U.S.C. § 1988 re award of attorney's fees to prevailing party and per federal guidelines and case authorities interpretive thereof should have been granted and said findings accepted." However, the brief subsequently announces that the Bachs have been unable to address the issue because of lack of time of John Bach, primarily due to the press of his other business. The Bachs' request for leave to address this issue in a supplemental brief was denied. Accordingly, we deem the claim of error in failing to issue findings waived. We note that the topic of explicit findings alleged to be mandatory is peripherally mentioned in other portions of the brief. However, none of these disclose that the Bachs made an intelligible or timely request for findings on the issue of the neighbors' entitlement to attorney's fees. (See Code Civ. Proc., § 632.)

assert the trial court's ruling is warranted by the absence of any indication that they engaged in any conduct other than the constitutionally privileged conduct of petitioning government for redress of grievances. We agree.

The neighbors rely upon federal case law interpreting the federal civil rights statutes under which the Bachs' cross-complaint was brought. The cases hold that private citizens' communications to zoning officials seeking to persuade the officials to engage in allegedly unconstitutional zoning activities are not actionable. (*Gorman Towers, Inc.* v. *Bogoslavsky* (8th Cir. 1980) 626 F.2d 607, 614-615; *Scott* v. *Greenville County* (4th Cir. 1983) 716 F.2d 1409, 1424; *Weiss* v. *Willow Tree Civic Ass'n* (S.D.N.Y. 1979) 467 F.Supp. 803.) The doctrine asserted in these cases is that such communications cannot be actionable since the First Amendment of the United States Constitution forbids statutes abridging "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." (Also, cf. *Blank* v. *Kirwin* (1985) 39 Cal.3d 311, 321-322 [216 Cal.Rptr. 718, 703 P.2d 58].)

The Bachs tender no conflicting case law on the point. Their sole rejoinder is the assertion that the doctrine is inapplicable to their claim because the neighbors supplied false information to county officials in the course of the effort to get the county to enforce the zoning ordinance against the Bachs. However, they do not tell us what information was false and it does not appear that the accusations of the neighbors were false in any material regard.

The doctrine asserted in *Gorman Towers, supra,* 626 F.2d 607, *Scott, supra,* 716 F.2d 1409, and *Weiss, supra,* 467 F.Supp. 1803, is neither novel nor subtle. Mr. Bach is an attorney and assumed responsibility for self-representation. In view of the existence of this case law line at the time the Bachs haled the neighbors into court the trial court was permitted to conclude that the action as against the neighbors was utterly without merit, lacking any foundation in law and unreasonable.[13]

## CONCLUSION

None of the other contentions or arguments warrants discussion. The judgment's award of damages to the Bachs is reversed with directions that

---

[13]We note that none of this reasoning supports an award of attorney's fees to the governmental defendants in this case. We further note that the litigation expenses of the governmental defendants were incurred in the course of litigating the zoning enforcement action brought by the county. The same matters tendered on the federal civil rights damages cause of action were tendered in the defenses to the state law zoning enforcement action. Accordingly, we hold that none of the governmental defendants are entitled to recover attorney's fees under 42 United States Code section 1988.

judgment be awarded in favor of all cross-defendants on the Bachs' federal civil rights cross-complaint. Insofar as the judgment denies injunctive relief to the County of Butte against use of the subject property for law office purposes, it is reversed and the matter is remanded for further proceedings consistent with the views expressed in this opinion. The judgment's denial of injunctive relief to the neighbors on their cause of action for violation of the restrictive covenant is reversed with the direction that such relief be accorded. With those exceptions the judgment and orders after judgment which are subjects of this appeal are affirmed.

Puglia, P. J., and Evans, J., concurred.

The petition of defendants and appellants for review by the Supreme Court was denied December 30, 1985.